144194 Mark Dragomier v. Local 1112 etal 1112 U.A.W. Oral argument not to exceed 15 minutes per side. Mr. Myers for the appellant. Good morning your honors. Good morning. I'm Ken Myers and I represent the appellants in this case. I'd like to reserve three minutes. All right. My clients are 27 auto workers that work for GM at the Lordstown plant near This case is about language. Specifically what do certain words mean and who gets to decide who means them. The issue is whether what have been known as the core and non-core documents unambiguously say that from that point forward in March of 2008 all new hires regardless of job function would be considered entry level and therefore have a lower what's called a tier 2 wage. If those documents do not unambiguously say that then do they say it at all? And there's a question as to whether they say it ambiguously or unambiguously. If it's unambiguous and it's clear what they say then the district court got it right. However if the documents unambiguously don't say that which is what I've claimed on my motion for summary judgment then the plaintiff should have been awarded summary judgment. What happens if it's ambiguous? It's ambiguous and it's a jury question. Really? Yes. Isn't in the 301 claim don't you have to show that the union acted arbitrarily? Isn't that your theory? Yes, yes. But if it's ambiguous So ambiguity usually means there are two reasonable options, right? So interpretation A or interpretation B that's what the ambiguity is, right? Right. And so if you pick one of the two ambiguous options how is that arbitrary in a 301 setting? Well I think it's arbitrary because the language, just because something is ambiguous doesn't mean that the other option is just as reasonable as the first option. I think the union had an obligation. That's the point of ambiguity. I mean you have a sentence and you look at the words, you look at dictionaries, you look at the context and you go hmm it could mean this. It would be reasonable to say it means this but it also would be reasonable to say it means this. That's what makes it good faith ambiguity. Well I think that where I would disagree judge is that I don't think it's necessarily a 50-50 balance. Just because something is ambiguous doesn't mean that this interpretation is just as good as this interpretation. It's our contention that the ambiguity was so far skewed that it's not reasonable to assume that the position taken by, eventually taken by the defendants was a proper position and therefore the union violated its duty. And the evidence of that is in the fact that they never, the union never even claimed that those documents were the rationale for them not filing a grievance until this lawsuit. I mean for years, for a couple of years when they were in front of their own internal boards, the international executive board and then the public review board, it never was stated this is our interpretation of the core and non-core documents. Those weren't even a fact. They weren't even turned over to the public review board until five days before the hearing. In fact, of the two core and non-core documents, only one was turned over. So maybe, well anyway, think about, it's just the question of one judge. I would have thought the way this worked is if you have ambiguity, which is I think the most you could say here, and you have two reasonable interpretations of it, you don't say which is the best of the two, and if you don't pick the best, the union has acted arbitrarily. I would have said if they're both within the range of reason, it's very difficult to say the union's acted arbitrarily. But let's just say I'm wrong about that for the sake of argument. Maybe another way to think about this is under your interpretation, what did they accomplish in 08? What was it that the clarification and the agreement accomplished if it didn't accomplish what both sides of the agreement thought it accomplished? In other words, did it do away with the non-core-core distinction? I don't think it did, Judge. I think that whatever the intent was, and again, I don't think it's... The senior people could, they couldn't do non-core jobs after... I can give them, said that there's a range of options that senior people could bump non-senior people into and take the non-core jobs, and that's what they said. I don't think it anywhere said that from this point forward, every new person is going to be considered non-core despite whatever job they do, and that every new person is going to be considered entry level. I don't see that reading just because they were reacting to the pushback of senior people who were saying, we want to be able to bid on non-core jobs. I think that those documents presented a range of options. These people, my clients, were really not on the radar screen. They were in a different category than other people that these documents may have intended to encompass. Did the 2007 agreement apply to them at all? Not the entry level MOU, and certainly not when they were temporaries. What about paragraph 98? Paragraph 98 did apply to them, both when they were temporaries and when they were hired in. The gentleman from GM, Bo Rose, even indicated in his deposition that paragraph 98 did apply to them. That's why they were given traditional wages when they came back as temporaries in November of 97. I'm sorry, not November of 07. Was this an evolving interpretation of what the parties intended throughout this period of time up until the time they were hired on in, what, June of 2008 as full-time employees? I think that's their position now. I don't think it was the position back then. I think the union's position and the company's position was, well, the union's position certainly was it was a mistake to pay them traditional wages. We're not going to call them on it because we don't want to have them lose that money, but when they came back in 07, the union's position was we're getting away with something. And the company's position later was, no, we intended to pay them traditional wages, but when we hired them in June, it went back down to entry level. But that wasn't the position at the time. When you say it evolved, it evolved when it became litigation. When my clients had gone all the way through this internal process and it got to court, that's when someone said, oh, we've got these core, non-core documents, let's use that. The local chairman and the international didn't even know those documents existed or what the import of them was. Let me ask you this. Isn't it true that the parties are currently in negotiations for a new contract? I believe that's true, yes. Isn't one of the stated distinctions, one of the stated goals of the union and the company to do away with the two-tiered system? I don't have any direct information on that, Your Honor. I've read some things in the newspaper that that's the union's goal. I don't know what the company's position is. And I will also say that I believe that that was also talked about in 2011, that there was some adjustment going to be made, and I don't think it was. I don't know what the state of the economy was at the time that they would have allowed that. But I don't think that that changes anything. If they put that language back in the 2015 contract, that would be great going forward. But my clients still have seven years of back pay at $10 an hour that is at issue here. But couldn't this be resolved at a mediation? This whole case? Well, we did attempt mediation through the Sixth Circuit. How long did that go on? Not very long. The other side offered basically nothing. And are all 27 of your workers still with the company? I just found out this morning that one is no longer with the company, but all the rest are. Yes, Your Honor. Does the record reflect where the wages are? Yes. They all signed affidavits showing what they were making at the time about a year ago when they were signed, as opposed to what the upper-level wage would have been had they been making it back from June of 2008. Tell me what that is. So it's a 40 percent cut initially, right, in return for benefits not being temporaries. You can't be laid off quickly. So you get those benefits. Is it still a 40 percent disparity, or has it gotten closer in terms of wages? I think it's gotten a little closer, maybe. It's maybe like 19 and 28. That sounds reasonable. I don't have that off the top of my head, Your Honor, but that sounds reasonable. This is a little bit of a variation on the question I asked before, but, you know, I just can't think of a contract case, so I'm not even just thinking labor law. I'm just thinking contract cases, how unusual it is to have the two parties to an original contract both agree it creates a problem, both decide to amend the contract to do something about the problem, both share agreement by the time they get to our court on what problem they were trying to correct, and both agree they've corrected that problem, and for the court then to say, well, sorry, I don't even know that case, but then what's even harder about your position, it's not just saying, sorry, we're not going to follow the interpretation both sides agree to, we're actually going to say it's arbitrary to do that. That one, I just, I don't know that case. Am I wrong? Can you tell me a case that proves I'm wrong about thinking that? The only case that I can think of that comes close to that is a case that I believe you authored regarding contract language and having to say what it means. Is this the prior GM case? No. CNH versus UAW? Yeah. In 2011? I said, okay, I'm going to look at it. The contract language has to say what it says, because the UAW was claiming in that case that, I'm sorry, the plaintiffs were claiming, they weren't individuals, but it was a company claim. Is that a health care case? A health benefits case? A VEBA case, yes. And they tried to claim that there was a covenant not to sue, and what you said in that case was, I don't see anywhere in here that says there's a covenant not to sue. So the equivalent that I'm drawing here is that somewhere along the line, those documents had to say... I'm pretty confident, I don't remember a VEBA case, and I've had a lot of them. It proves I've got a lot to account for in life. I just keep drawing these darn cases. But I don't remember a single one, not a single one, where the union and the company agreed about the point of that litigation. They didn't agree. And the point I'm trying to make is, I can't imagine one of those cases where union and company both agree on, it covers health care benefits or it doesn't, and then us saying, we're going to ignore your agreement about that. May I answer, Judge Clay? Yes, go ahead. My only answer to that is, I certainly can't point to a specific case that says that, Judge Clay. The availability of this remedy, of bringing a hybrid 301 case and a separate BFR case, wouldn't exist if people like my plaintiffs didn't have some third-party beneficiary rights, some ability to say they got it wrong and they took something away from us that they shouldn't have taken. So my clients didn't have the ability to sit at that table and parse out the meanings. But they were affected by it, so they have the right to... Well, I think that is a good answer. But I still can't think of one of those cases where there's so much agreement about such a discrete point. That's what's odd to me. I think you have to look at where the agreement took place. This didn't become an agreement that meant what it now means until two years after they signed it. I reserve the rest of my time. Yes, you'll have the rest of your time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm Shai Dvoretsky with Jones Day representing General Motors. With the Court's permission, I'd like to take seven minutes to focus principally on the issue of why GM didn't breach the CBA. The counsel for the local and international union would like to take four minutes each to focus principally on why the union didn't breach its duty of fair representation. The appellants concede in their reply brief that the March agreements modified the entry-level MOU. Following extensive discovery, though, they can offer no account of what those March agreements did, and that's fatal to their claim. In fact, the only plausible account of what the March agreements did is the one shared by the parties to those agreements. That understanding, that the March agreements modified the definition of an entry-level employee from the entry-level MOU, follows from the text, the history, the contemporaneous evidence, and the deposition evidence about the meaning of these agreements. First, with respect to the text, the entry-level MOU was monumental because for the first time it established a two-tier wage system at GM. The parties contemplated at that time that such a big change could require later changes in implementing its details, and that's exactly what the parties did in the two March agreements. On their face, those two agreements purport to deal with implementation issues about the entry-level MOU, and critically, they set up a scheme for assigning employees to particular jobs that modifies and is, in fact, inconsistent with the scheme that was set up in the original entry-level MOU. Under the March agreements, there's a three-step process. First, GM and the unions agree how many of the lower-paying jobs would be at each particular plant. It was 515 for the Lordstown plant. Second... Who makes that determination? That's made between GM and the International, I believe, and the March 2008 agreement contains an appendix showing what the number of jobs was for each particular plant. So there's a fixed number of lower-paying jobs in each plant. Particular jobs are filled by seniority. This was what the union wanted in response to the backlash against the original 2007 entry-level MOU. Once seniority is exhausted, GM can hire from the outside, and then once the fixed number of lower-paying jobs is satisfied, at that point, the most senior of the entry-level lower-paid employees can move up to the traditional higher wage scale. That entire scheme expressly contemplates that both lower-paid and higher-paid workers, both core and non-core workers, can be doing any kind of work. And the assignment of workers to particular jobs would be based on seniority rather than on the scheme that was originally contemplated in the 2007 entry-level MOU. That understanding came about because of the backlash against the original scheme. Almost immediately negotiations began to fix this because, as the plaintiffs themselves admit, this just caused a huge uproar. Third, there's contemporaneous evidence, before litigation ever started, and in fact before the March agreements were even signed, that this is what the parties were doing. The local union distributed flyers at the plant. The flyers explained that in response to the original entry-level MOU, the union had been advocating for seniority to prevail, and in fact the parties had agreed that, quote, the assignment of traditional and entry-level employees to core and or non-core jobs will be based on seniority and determined by the local union. That's at page 4792, page ID. That flyer... Wouldn't you say the 2008 agreements are at least ambiguous? I don't think they are ambiguous because, on their face, they're implementing the previous agreement and they're doing it in a way that's inconsistent with the previous agreement, and therefore they're changing it. But even if they were ambiguous, that still wouldn't help the plaintiffs here, not only for the reason that Your Honor suggested earlier, that if there are two reasonable interpretations, there's no breach of the duty of fair representation, but also because, as a matter of ordinary contract interpretation, if an agreement is ambiguous, all that means is that we look at the extrinsic evidence. And here, following extensive discovery, the only extrinsic evidence supports GM's and the union's interpretation of this agreement. There's no extrinsic evidence supporting any other account of what this defendants prevail, because there are at least two reasonable meanings, but there aren't even two reasonable meanings in light of all of the extrinsic evidence, which unequivocally supports only GM and the union's interpretation, the understanding of the parties to the contract. What were these people told upon signing on to full-time status? By whom? What did GM authorize them to be told? I don't know that GM was involved in the discussions of what they were told, except with the job offer forms that they signed, which expressly said that they would be accepting a job at the lower wages. There is testimony in the record about what they were told by union officials, and a number of the plaintiffs testified that they were told that... Sign this or you're out the door. Well, sign this or you're out the door follows only because they're temporary employees and therefore could have been out the door for any reason. But they were told that there was a wage reduction, that the possibility to go to a higher wage was tied to the addition of a third shift, and I think there's conflicting testimony in the record, which the union's counsel I think can address, about what they were told about the likelihood of that third shift. But I think the key point there is they were told that it was tied to a third shift that ultimately didn't materialize, but in... Who did Professor Schwartz represent in the drafting of these agreements, the negotiation of these agreements? I don't know the answer to that question. Perhaps one of my co-counsel can... Because I think when pressed, he had to admit, Judge Sutton's point, that the agreements were somewhat ambiguous. They didn't say what they were supposed to say. Well, I don't know I think that properly understood both on their face and in light of the extrinsic evidence, they did say what they were supposed to say. And particularly with the extrinsic evidence which supports only one side, only one plausible interpretation, that leads to summary judgment for the... Why doesn't GM fix this for these 27 employees? Why aren't they willing to do that? Well, I think because GM has a contract that we believe is clear. That applies to uniquely to these 27 people as it's applied in this case, right? I mean, these are the only folks that are in this category. These are the only individuals who are in this case, but GM is simply enforcing the terms of the contract that it and the union agreed to and that it and the union agree are clear. Well, there also were some zero-sum components to this. If 27 people, it would have prevented 27 senior people from not doing non-core jobs. I mean, there are two sides to this problem, right? I mean, one of the things was to fix the option of senior employees to do non-core jobs. I mean, I suppose if you keep hiring people and keep creating jobs for them, you can solve all kinds of things, but I think the car companies have tried that before. We've seen that movie. It never seems to end well. This is all prelude to the bailout, correct? That's right. All right. Thank you, and we'll hear from your colleagues. May it please the Court, I'm Charlie Oldfield, and I represent Local 1112. I want to begin by addressing a point or a question you raised, Judge Sutton, which is if this contract is ambiguous, we don't concede that it is, but if the contract is in fact ambiguous, there's no evidence that would support the plaintiff's conclusion that the union's decision to choose one interpretation over another interpretation was a breach of the duty of fair representation. To find a breach of duty of fair representation, you heard held in garrison that the union's decision-making process was wholly irrational, and in making that determination, you have to look at the totality of the facts and circumstances as known to the union at the time it made the decision not to file the grievance. What about his point that it may be that by the time the case reached us, there were two reasonable interpretations and interpretations that respected the language, but that at different phases of the case, the position of the union changed a little bit and it wasn't as well articulated. Shouldn't we account for that? You shouldn't, Your Honor, because that doesn't change the fact that the union's decision at the time it made it was rationally based on the information the union had at the time. If you look at the shop flyers that were issued by the local union from October of 2007 to the implementing documents in March 2008, it was clear that the local union knew that this two-tier wage structure was an ongoing process. There wasn't a clear directive on how it was going to be implemented at the time. And that was made clear to the local union members. The shop flyers were actually distributed along the plant line to the employees and were made available to them. So the union knew all along that this was an ongoing negotiation between the national parties because of the pushback from the senior union members. So the fact that... First of all, I don't think that there was any change in the reasoning. It's certainly become more refined and more clear at this stage, but that doesn't change the fact that the union's decision to not file the agreements in 2008 was rationally related to the information it had at the time, and that's what the court has to look at. I just want to make sure what the record reflects and what it doesn't in terms of where these 27 employees' wages are. I guess it's now 26 if one's left, but where are they? If there was a 40 percent differential upon being hired, what is it now, out of curiosity, if the record reflects that? I don't know that the record actually reflects what the actual difference is now. They are still being paid a lower wage. They are still under the interest rate. I was just curious whether seniority allowed it to decrease the gap. I guess my intuition is that it would, but maybe I'm wrong about that. I believe that it has because they are still under a wage progression. When they were under Paragraph 98 as temporary employees, they were subject to a wage progression as all employees were at that time, and it was all the same wage progression. Once the new entry-level MOU with the implementing documents was actually put in place, there was still a wage progression for entry-level employees, so they would start off at a 40 percent reduction and then move up from there. In fact, what the national parties were able to do for these particular plaintiffs, since they had been under the Paragraph 98 wage progression, when they put the implementing documents in place in March of 2008, they didn't make them start over even at the bottom of that wage progression. They put them at the same spot on that wage progression as they had been under the Paragraph 98 wage progression. Which would be what today? I can't answer that, Your Honor. I'm sorry. I don't know exactly what their current pay rate is right now. I want to address one other point, if I may, about what the plaintiffs were told when they were signing these documents in June of 2008. At that time, the union was aware and GM had announced that they were going to add a third shift at the Lordstown plant. Right. That didn't materialize. It did not materialize. I see I'm almost out of time. May I finish my point? Yes, go ahead. The union knew that these people were going to be hired as regular entry-level employees at their wages, were going to drop down to the entry-level wage. The evidence is that the union, Ben Strickland, instructed his committeemen to go to the line, pull these plaintiffs offline, tell them you're going to be offered permanent positions, which, with all the attendant benefits of that, insurance and so forth, but you're going to go down to an entry-level wage. Once hiring reached a certain number, then you could go back up to the traditional wage rate. Many of the plaintiffs testified that they were told that the return to the traditional wage rate was tied to a certain amount of hiring of regular employees, which did not occur. Thank you. Thank you. Good morning. I'm Joyce Goldstein, and I'm here representing the International Union of the UAW. I'd first like to say that I agree with all of the, what I heard from the two other co-defendants in the case, counsel for GM and counsel for the local. I'd like to just briefly mention a couple of points that are specifically related to the International Union. Unique from the comments that have been made generally about the collective bargaining agreement and the DFR standard. The heart of the case against the International Union is that the International breached its duty of fair representation by not directing the local to file a grievance. And in the grievance procedure, the International's role under the UAW's constitution is to administer an appellate procedure, the procedure before the, that goes, as the court knows, before the International Executive Board and onto the Public Review Board. As high as the DFR standard is generally to show that the conduct of the Union was arbitrary, discriminatory, or in bad faith, it's really quite difficult to ever satisfy that standard when it's applied to an International Union acting in its appellate capacity of administering an appellate procedure. The burden on the plaintiffs would be to show that the International Executive Board or the PRB themselves acted irrationally and indeed no court has ever found that and there's not been any evidence to suggest that here in this case. So for that reason, if, in addition to all others, the International maintains that there is no breach of its duty of fair representation. Why can't all three of your clients simply fix this for these 26 people without admitting anything and take it out of our hands? Your Honor, the UAW, both the International and the local, very much wanted to do that, but the contract doesn't permit it. So the Union can't compel General Motors to do that. The Union, unfortunately for the plaintiffs, agrees that we have a consistent interpretation of what the collective bargaining agreement says. You're in negotiations now for a new contract. Yes, that's correct. Why couldn't this be taken up as part of that? I suppose it could be if that was, you know, a priority of the bargaining teams in addition to whatever else is on their plate. For this round of collective bargaining, it could be. Isn't it part of the Union's understanding that they want to do away with the two-tier system? It's my understanding, yes. I mean, the Union never wanted a two-tier wage system. What Union does, unfortunately, the Union agreed to it at the time as a way to help save General Motors, and I guess it worked. I mean, they're still here post-bankruptcy and post-reorganization. So, you know, of course the Union doesn't want a two-tier wage system, and in this particular case, the Union officials, both Mike Grimes, who is my client for the International, and Ben Strickland for the local Union, both approached the company and asked them to increase the wages for these people. The problem here is that the parties agreed to a two-tier wage system, and the first people that it impacted were the plaintiffs in this case, and the question was raised before. No, not only, sir. Not only, Judge. They were the first. The two-tier wage system has existed since that time. Everyone who's been hired since then has been hired at the lower-tier wage. So, it's... Other temporary, former temporary workers been hired? It could have been former temporary workers or others just hired off of the street. No particular additional status was granted to former temporary employees because they didn't ever accrue seniority under the Union. I see that you're out of time. I see that I am. Thank you. Thank you. A couple of points. First of all, my clients were the only people who were already making the top wage under paragraph 98 when this new rule came in, the two-tier wage system. So, they were the only people affected by it. Second of all, to... Does the record reflect, does the record show that, that in all GM plants, this is the... I mean, I'm just surprised. This is one plant. This is Lordstown. There are a lot of other plants. Are you saying the record shows that these are the only people that were temporaries that were then hired and were under the lower-tier? I guess I'd be kind of stunned by that because I would think they're temporaries at every plant. Right. I can't say that there's a document in the record that reflects that they are the only ones. I believe there was some testimony to that effect. Wouldn't it have been only about Lordstown? Because that's what this case is about. Correct. Like I said, I think there was some testimony to the effect. I can't place it right off the top of my head, but I believe there was some testimony to the fact that these were the only people that were affected in this way. They were kind of caught in this squeeze. There were no other temporary workers in any other GM plants that were then hired under the two-tier structure which has been in place ever since then? That had already been making the top wage. I believe that's correct. I believe that's correct because these people were hired after the implementation of the new contract, but they were still hired at the top wage because they had come in. They had been long-time temporary employees. They had already achieved pretty much the top level of the progression as it existed at that time. So I believe they certainly were the only people at Lordstown. You're making a point about the top level. I guess I would have thought that there are temporary employees everywhere and wherever they were when they were hired permanently, if they accepted that offer, they were going to take a reduction. So that must have been going on throughout the plants. Again, I don't think that's true, but I can't point you to the exact place in the record where that says that. A couple other points very quickly to answer Ms. Goldstein. It wasn't just that the Union didn't direct, that the International didn't direct the local to file a grievance. There was this phone call between Mr. Grimes from the International and Mr. Schwartz, who was from GM, where he just basically said, can I get these guys hired? Can I get them at the top tier? Mr. Grimes didn't know, neither did Mr. Schwartz, that the plants were already at the top tier, were already at the top of the progression, and I think that would have made a difference. There was no investigation by anyone at the International on that issue, and that's one of the reasons we claim it was a violation of their DFR. To answer Judge Sutton's question earlier about what the ripple effect was, my clients never were working non-core jobs. They started out working core jobs, they're still working core jobs. They weren't taking those plum non-core jobs from anybody else. It was a zero-sum game. So I think that kind of answers Judge Watson's question about why can't these people be accommodated, and I see that my time is up. All right, thank you, and the case is submitted.